MAX ROSENBLOOM V. STATE OF NEBRASKA.

FILED APRIL 2, 1902. No. 12,451.

1. **License Tax: PEDDLER: TAXING POWER: POLICE POWER.** The law imposing a license tax upon peddlers (Compiled Statutes, 1901, ch. 77, art. 1, secs. 152-154) has for its object the raising of revenue, and its enactment was an exercise of the taxing power, and not the police power.

2. **Constitutional Law.** It is settled doctrine that the courts will not declare an act of the legislature unconstitutional unless it is manifestly so.

3. ———: REVENUE LAW: FINE AND IMPRISONMENT. The provision of section 154 of the general revenue law authorizing fine and imprisonment as a means of enforcing a license tax does not trench upon the constitution, and is therefore valid. *State v. Green*, 27 Nebr., 64; *Magneau v. City of Fremont*, 30 Nebr., 843, and *Templeton v. City of Tekamah*, 32 Nebr., 542, overruled.

4. Act: COMPREHENSIVE TITLE. An act entitled "An act to provide a system of revenue" covers the entire subject of taxation, and comprehends whatever means or machinery the legislature may provide to enforce payment of taxes.

5. Classification for Taxation. The provision of the constitution (art. 9, sec. 1) authorizing the taxation of persons engaged in certain occupations, in such manner as the legislature shall direct by general law, uniform as to the classes upon which it operates, forbids partiality and favoritism and makes equality before the law a rule of legislative action. It does not, however, forbid reasonable classification of persons for the purpose of taxation.

6. Arbitrary Classification: PUBLIC POLICY: DIVERSE LEGISLATION. Classification, to be valid, must not be arbitrary. It must rest on some reason of public policy,—some substantial difference of situation or circumstances that would naturally suggest the justice or expediency of diverse legislation with respect to the objects or individuals classified.

7. Traveling Vendors: OWN PRODUCTS: PRODUCTS OF OTHERS: DIFFERENCE. There is such a real distinction between persons who go from house to house and place to place vending their own products and those who sell in the same way the productions of others that the legislature, acting on considerations of general policy, may make it the basis of classification for the purpose of taxation.

8. Particular Classification. A particular classification may be valid if the object of the statute is to raise revenue, and invalid if the object is regulation.

9. Occupation Tax. The law imposing an occupation tax upon peddlers is sufficiently certain to be capable of enforcement.

ERROR from the district court for Platte county. Tried below before GRIMISON, J. *Affirmed.* HOLCOMB, J., dissenting.

*McAllister & Cornelius,* for plaintiff in error.

*Frank N. Prout, Attorney General, Norris Brown, Deputy,* and *William O'Brien,* for the state.

SULLIVAN, C. J.

Max Rosenbloom, defendant below, having been con-victed of peddling in Platte county without a license, seeks by this proceeding to obtain a reversal of the sentence. The statutory provisions which we have occasion to con-sider in disposing of the questions presented for decision are found in the general revenue law (Compiled Statutes, 1901, art. 1, ch. 77), and are here set out:

"Sec. 152. Peddlers plying their vocation outside of the limits of a city or town within any county in this state and peddlers selling by sample outside of the limits of a city or town within any county in this state shall pay, for the use of said county, an annual tax of twenty-five ($25) dollars; those with a vehicle drawn by one (1) animal, fifty ($50) dollars; those with two (2) and less than four (4) animals seventy-five ($75) dollars; those with four (4) or more animals one hundred ($100) dollars. Nothing in this sec-tion shall be held to apply to parties selling their own work or production, or educational, either by themselves or employes, nor to persons selling at wholesale to merchants, nor to persons selling fresh meats, fruit, farm produce, trees, or plants exclusively.

"Sec. 153. A certificate or license shall be issued to any such peddler by the county clerk, upon the presentation of a receipt showing the payment of the proper tax to the county treasurer, and such certificate, or license, shall be good only in the county where issued, and shall not au-thorize peddling in cities and towns.

"Sec. 154. Any person peddling outside the limits of a city or town in any county within this state, without such certificate, or license, or after the expiration thereof, shall be deemed guilty of a misdemeanor, and the person actu-ally peddling is liable, whether he be the owner of the goods sold or carried by him or not, and upon conviction thereof, shall be fined the sum of fifty ($50) dollars and stand committed until the fine is paid, or he be discharged as provided by law; and if any peddler refuses to exhibit his

license to any person requiring a view of the same, he shall be presumed to have none, and if he produces a license upon trial, such peddler shall pay all costs of prosecution."

It is conceded that the facts alleged in the information exist, but it is insisted that they do not constitute a crime. The argument is that the law taxing peddlers trenches in various ways upon the constitution, and is therefore void. It is said in the first place that the object of the legislation is to raise county revenue, and that revenue measures can not, in this state, be enforced by the infliction of fines or penalties. We agree with counsel in the view that the primary and paramount, if not the only, object of the law, is to obtain revenue, by imposing a tax upon the business of peddling. The only thing the peddler is required to do is to pay his tax, and exhibit the appropriate evidence of payment to any person who may wish to see it. The only thing he is forbidden to do is to pursue his calling without having first paid the tax. No police inspection or supervision is provided for. If the things commanded and forbidden are to be regarded as features of regulation or repression, they are not, to say the least, so pronounced or conspicuous as to suggest the idea that the law is referable to the police power, rather than to the power of taxation. But granting the contention of counsel for defendant that the statute is a revenue measure, pure and simple, we are not able to discover any valid objection to the enforcement of it in the manner provided by the legislature. It is settled doctrine in this and in every other jurisdiction that courts will not adjudge statutes unconstitutional unless they are plainly so. Now with what express provision of the higher law does the statute in question clash? We know of none. It may, perhaps, be said that imprisonment for debt has been abolished; but taxes are not debts, within the meaning of the constitution, and if they were, the provision with respect to a fine and that with respect to imprisonment are not so inseparably connected that they must stand or fall together. "The law abolishing imprisonment for debt," says Judge Cooley, "has no application to

taxes; and the remedies for their collection may include an arrest if the legislature shall so provide." Cooley, Taxation [2d ed.], 17. In speaking of license taxes the learned author further remarks that it is still customary to enforce payment of them by arrest and imprisonment, adding that "a constitutional provision inhibiting imprisonment for debt has no application to the case of a license tax." Cooley, Taxation, 438. Among the many cases sustaining this view, we cite the following: *Appleton v. Hopkins*, 5 Gray [Mass.], 530; *Daggett v. Everett*, 19 Me., 373; *McCaskell v. State*, 53 Ala., 510; *Commonwealth v. Byrne*, 20 Gratt. [Va.], 165; *Denver City R. Co. v. City of Denver*, 21 Colo., 350; *City of St. Louis v. Sternberg*, 69 Mo., 289; *Campbell v. City of Anthony*, 40 Kan., 652; *City of Bozeman v. Cadwell*, 36 Pac. Rep. [Mont.], 1042; *City of Cincinnati v. Buckingham*, 10 Ohio, 257; *In re Dassler*, 35 Kan., 678. Limitations upon legislative power are to be found in written constitutions; it has not been customary to look for them in the opinions of the courts. When it pleased the people of this state to put an end to the ancient practice of seizing the person of a debtor as a means of coercing payment of a debt, they put into the bill of rights this expression of their sovereign will: "No person shall be imprisoned for debt in any civil action on mesne or final process unless in cases of fraud." Bill of Rights, sec. 20. This language is terse and lucid; it means just what it says, and, when considered in the light of familiar history, it seems hardly possible to misunderstand it. It deals only with procedure in civil actions,—actions having for their object the collection of debts; it has no application to the civil liability created by the bastardy act (*Ex parte Cottrell*, 13 Nebr., 193; *Ex parte Donahoe*, 24 Nebr., 66), and it has certainly no relation whatever to criminal actions brought by the state to punish the violation of a public law. The just and humane policy of abolishing imprisonment for debt can not be too highly commended, but an extension of that policy by judicial decision can be defended only on the theory that beneficent usurpation is justifiable.

Three cases decided by this court (*State v. Green*, 27 Nebr., 64; *Magneau v. City of Fremont*, 30 Nebr., 843, and *Templeton v. City of Tekamah*, 32 Nebr., 542) declare that penal provisions of an occupation tax ordinance are unenforceable; but these decisions do not profess to rest in either reason or authority, and are, in our judgment, contrary to both. If they had become a rule of property, we should certainly adhere to them, but since they have not, we think they should not be regarded as binding precedents; and they are accordingly overruled.

Another ground upon which the law is assailed is that section 154, which prescribes penalties for peddling without a license, is not embraced within the title of the act. The title is a very comprehensive one; it is "An act to provide a system of revenue," and, *ex vi termini*, covers the entire subject of taxation; it comprehends the selection of the persons, property and franchises to be taxed, the manner and method of making the assessment, equalization and levy, the amount of revenue to be raised, the means or machinery by which the taxes are to be collected, and many other matters obviously germane to a general scheme or plan for providing funds with which to defray the necessary expense of maintaining a state and local government. A law to provide a system of revenue would be singularly weak and inefficient if it did not make adequate provision for the collection of taxes. In fact, every revenue law does contain such provisions. The usual and appropriate method of enforcing payment of a property tax is by the addition of an increased rate of interest, which is in truth a penalty, and by the sale of the taxed property. But payment of taxes on occupations can not be enforced in this way and hence the ordinary, and often the only effective, method of compelling payment, is by fine and imprisonment of the person upon whom the tax is imposed. In the recent case of *Nebraska Loan & Building Ass'n v. Perkins*, 61 Nebr., 254, it is said: "If no portion of the bill is foreign to the subject of legislation, as indicated by the title, however general the latter may be, it is in harmony

with the constitutional mandate." Tested by this rule it is, we think, entirely manifest that the penal provision of section 154 is covered by the title of the act.

A further contention of counsel for defendant is that, by reason of the exceptions contained in section 152 the law lacks the essential requirement of uniformity. The constitution (art. 9, sec. 1) declares that the legislature may impose a tax upon persons engaged in certain occupations "in such manner as it shall direct by general law, uniform as to the class upon which it operates." This provision undoubtedly contemplates that all persons pursuing the same business or calling under the same conditions and circumstances shall be treated alike, and subjected to the same burdens; in other words, partiality and favoritism are forbidden, and equality before the law is made a rule of legislative action. But as was said by the supreme court of Pennsylvania in *Seabolt v. Northumberland County,* 187 Pa. St., 318, "Classification is a legislative question, subject to judicial revision only so far as to see that it is founded on real distinctions in the subjects classified, and not on artificial or irrelevant ones, used for the purpose of evading the constitutional prohibition." In the case of *State v. Farmers & Merchants' Irrigation Co.,* 59 Nebr., 1, 4, we had occasion to consider this question, and reached the conclusion, after a pretty thorough examination of the authorities, that the "classification, to be valid, must rest on some reason of public policy, some substantial difference of situation or circumstances, that would naturally suggest the justice or expediency of diverse legislation with respect to the objects classified." The real test of the validity of defendant's objection to this statute is not whether the classification is wise and just, but whether the legislature acted arbitrarily,—whether, without an adequate determining principle, it made a division of peddlers into two classes, and then sought to deprive one class of their constitutional right to the equal protection of the laws. If there is a genuine and substantial distinction between persons who go from house to house, and place to place, vend-

ing their own products, and those who sell in the same manner the productions of others, the classification is founded in the nature of things, and is therefore upon a basis everywhere recognized as lawful.   Now, there is, in our opinion, such a marked and material difference between the two classes of peddlers as to make it entirely proper for the legislature, acting on considerations of general policy, to tax one class and to permit the other to go free. The man who goes about the country selling what he has himself produced may be presumed to confer a benefit upon the general public by eliminating the profits of the retail merchant, and perhaps even those of the wholesaler and jobber.   He has a fixed abode where he produces the things which he sells, and where he may be reached and required to make good his warranties.   He is generally the owner of immovable property which is subject to state and local taxation.   It may be that he is required by the municipality in which he lives to pay a poll tax and a tax upon his business; to build and repair sidewalks, and keep the same free from snow, ice and other obstructions.   He contributes to the social, educational and financial prosperity of the community in which he resides.   He bears a just share of the burdens of government.   And, in addition to all this, it must be remembered that the sale of his products is only incidental to the business of producing them.   These characteristics, speaking generally, distinguish the untaxed peddler from the peddler who is taxed, and they are, it seems to us, quite sufficient to justify the classification which the legislature has made.   In *State v. Stevenson*, 109 N. Car., 730, a license tax upon merchants was upheld although it exempted purchasers of farm products from the producers. The court, after observing that the law puts all merchants dealing in farm products purchased of the producers in one class, and all other merchants in another class, and treats all in each class alike, goes on to say: "There is no discrimination in either class.   The power to select particular trades or occupations and subject them to a license tax can not be denied to the legisla-

ture—nor the power to tax such trades according to different rules, provided the rule in regard to each business is uniform." The supreme court of Maine had before it in a recent case the question we are now considering. *State v. Montgomery*, 43 Atl. Rep., 13, 16. In delivering judgment sustaining the law, Savage, J., said: "It is contended that the exception which permits one to peddle without license 'the products of his own labor, or the labor of his family, any patent of his own invention, or in which he has become interested by being a member of any firm, or stockholder in any corporation which has purchased the patent,' is a discrimination in favor of some and against others. We do not think so. If one may peddle freely the products of his own labor, so may all. The products may be unlike, but the freedom to prosecute one's own business and to peddle his own products is free alike to all. So of the other exceptions. While it may happen that various producers may peddle each the product of his own labor without license, but not of the labor of another, still we think this fairly answers the requirements of uniformity. The legislature is the sole judge of the extent to which the business of peddling should be regulated, and its conclusions are final, so long as the burdens imposed do not bear unevenly upon citizens. *Ex parte Thornton*, 12 Fed. Rep., 538." This decision is in conflict with *State v. Wagener*, 69 Minn., 206, referred to in the brief of counsel for defendant. In each case the statute construed was held to be a police regulation having for its object the protection of the public. In this case we have no occasion to determine which view of the matter is correct, because the classification in our statute was made for the purpose of taxation and not for the purpose of regulating the business of peddling. It is plain, of course, that a particular classification may be valid if the object of the legislation is revenue, and invalid if the object is regulation.

The law is also assailed on the ground that it lacks definiteness and certainty, but we think there is so little merit

in this objection that it may be overruled without discussion.

The judgment of the district court is

AFFIRMED.

HOLCOMB, J., dissenting.

Although entertaining the profoundest respect for the legal ability, erudition and discriminating judgment of my associates, I am unable to concur in the majority opinion formulated by the chief justice in this case, and will, as briefly as is consistent with reasonable clearness of expression of my own views, give some of the reasons which impel me to dissent therefrom.

The conclusion reached necessitates the overruling of several prior decisions of this court, of many years' standing, which have become and should be regarded as the settled law of the state; and this I am unwilling to assent to, because the principle of *stare decisis* is, in my judgment, too lightly regarded, and the overturning of the adjudications referred to is without sufficient cause. The law as therein enunciated has stood unchallenged for over a decade, and should not now, except upon the most weighty and grave consideration, be overturned. The doctrine, as expressed in the overruled decisions, as to the power to enact laws providing for imprisonment to enforce collection of taxes, is itself sound in principle, and supported by both reason and authority. The soundness of these decisions has not been challenged since they were enunciated, and they should not now be overruled unless unmistakably and radically unsound in principle. The course of legislation has been consistent with the constitution as construed in these overruled decisions. The charters and ordinances of the cities and towns have been enacted and enforced in conformity with the law as thus construed. The whole history of jurisprudence of the state lends color and support to the principle as announced therein, to the effect that the collection of taxes is to be enforced by the application of remedies civil only in their nature. It is aptly said

by **Mr.** Justice White, in a dissenting opinion in *Pollock v. Farmers' Loan & Trust Co.,* 157 U. S., 429, 650 (and I can do no better than quote his words) : "The conservation and orderly development of our institutions rests on our acceptance of the results of the past, and their use as lights to guide our steps in the future. Teach the lesson that settled principles may be overthrown at any time, and confusion and turmoil must ultimately result. * * * The fundamental conception of a judicial body is that of one hedged about by precedents which are binding on the court without regard to the personality of its members. Break down this belief in judicial continuity, and let it be felt that on great constitutional questions this court is to depart from the settled conclusions of its predecessors, and to determine them all according to the mere opinion of those who temporarily fill its bench, and our constitution will, in my judgment, be bereft of value and become a most dangerous instrument to the rights and liberties of the people."

It is worthy of note that of the five eminent jurists who have graced the bench we now occupy, and who have all expressly concurred in the views as stated in the several decisions it is now proposed to overthrow, two of them were honored members of the constitutional convention which formulated the organic law of the state which they afterwards were by the people of the state called upon to interpret and expound. Who shall say that these men, not only because of their great learning, but also on account of their presence and participation in the work of that convention, were not in a peculiarly advantageous position, and well qualified to correctly interpret and construe the several provisions of that important document? When it was held in the case of *State v. Green,* 27 Nebr., 64, that an occupation tax is to be collected by distress and sale of the property of the tax debtor in the same manner as the collection of debts generally, and not by imprisonment, the conclusion, I assume, was arrived at on the theory that by the adoption of the constitution, with its provision

against imprisonment for debt in any civil action except in case of fraud, an occupation tax was a debt, within the meaning of the word as used in that instrument, and there-fore collection thereof could be enforced only as other civil obligations.  The language of the constitution is fairly sus-ceptible of this interpretation without doing violence to any well-recognized rule of construction.  If a tax is treated as a debt, as it is by all authorities, then the con-struction was proper, and the fact that no lengthy reasons were given in support of the decision in no way militates against its soundness.  I am aware that in many jurisdic-tions a distinction is made between a debt created by the levy of taxes and those arising ordinarily between individ-uals on contract or otherwise.  But the reason given for such construction is not free from imperfection, and is in some cases warranted, because of substantial difference in the language of the law which was being construed. The logic of the majority opinion is to hold that in a purely fiscal measure, enacted solely for the purpose of raising revenues, the enforcement of the provisions of the act, and the collection of dues levied thereunder, whether on prop-erty, person or business, may be coerced by invoking the aid of the criminal law, and the infliction of fines and imprison-ment on the person on whom the obligation rests, regard-less of the question of his ability to meet the obligation, or the possession of property or means wherewith to satisfy the same.  The doctrine, if extended to its legitimate scope and breadth, authorizes every municipality in the state to levy taxes on the person, property and business of the in-habitants thereof, within the limits of the law, and to co-erce payment by arrest and incarceration of the delinquent until the taxes are paid, or until a judgment of fine and imprisonment is satisfied.  This, to me, is a startling doc-trine, and thoroughly repugnant to our entire system of jurisprudence, and in conflict with the very letter of the constitution itself.  Such a construction, it seems to me, is contrary to the constitution, as evidenced by the terms of that instrument, the course of judicial construction since

27

its adoption, and the character of the legislation enacted with reference thereto. A tax, in this state, has always, so far as my knowledge extends, been regarded as a civil liability of the same general character as other debts, and so considered by both the courts and the legislature. With reference to real estate taxes even the personal civil liability has been eliminated, under the laws in relation thereto as construed by this court; and all such taxes are held to be only a charge against the real estate against which levied, to be satisfied by a sale of the property, and not by recourse to the personal liability of the owner of the property when assessed. A personal property tax, or a tax on a business or calling, has heretofore, I think, without exception, been treated as a civil liability against the person to whom assessed, for the enforcement of which the taxing authorities could resort only to remedies common to the collection of other civil liabilities. In a very recent suit we decided that a civil action was maintainable for the recovery of personal taxes in the same manner as for the recovery of debts generally. *Hoover v. Engles*, 63 Nebr., 688. In fact, the entire history of the state, both judicial and legislative, since the adoption of our present constitution, so far as my knowledge extends, has treated the obligations imposed for revenue purposes on the same plane as debts generally; and the collection thereof to be enforced in a civil action, and not by punishment in a criminal proceeding, by fine and imprisonment. I venture to say that a search will be made in vain for an utterance either by the courts or the legislature of the state during the last quarter of a century indicative of the power of the legislature to authorize the coercion of the payment of the public revenues in a criminal action by fines and imprisonment. Is it not fairly inferable, since the legislature has made no attempt to authorize the enforcement of the collection of the revenues necessary for the expense of government, except by civil remedies, such as are common to the enforcement to all civil obligations, that it, too, has given a construction of the constitution in harmony with

the prior utterances of this court? Is it not reasonable to say that the legislature, enacting laws for the collection of the public revenues, would, in all probability, go as far as its powers were deemed to extend? The necessity for the speedy collection of all such taxes, and that all against whom the charge is made should bear their just proportion of these necessary public burdens, would naturally suggest to any legislative body the wisdom of making the payment of the obligation as certain and prompt as might be done under a full exercise of the powers belonging to the legislature in that regard. Can there exist any reasonable doubt that for over a quarter of a century the legislature and the courts of the state have deemed the power of coercing payment of the public revenues exhausted when all remedies for its collection permitted in actions civil in their nature had been provided for? I am not speaking of license taxes, but of measures purely fiscal, for the collection of revenues generally in support of government, and as the term is ordinarily understood. I shall speak of license taxes later on. If the legislature and the courts during this long period of time have so construed the force and effect of the constitutional provision referred to, then I submit that it is now too late to undertake to give to it an entirely inconsistent and contrary construction. But it is said in the majority opinion that it is not all civil liabilities that are included in the purview of this provision of the constitution, and we are cited to authorities holding to the right of imprisonment under the bastardy act, which is denominated a "civil action." These authorties, however, expressly hold that while the action is in its nature civil, as distinguished from a criminal trial, yet the law, as enacted, is an exercise of the police powers of the state. *Ex parte Donahue,* 24 Nebr., 66. As a police regulation, the imprisonment is lawful, and it was competent for the legislature to provide for imprisonment as a means to the desired end. It is not to be doubted that, in the exercise of the police powers of the state, imprisonment is justified and warranted for the preservation of public morals, good order and the peace and welfare of society.

A similar constitutional provision against imprisonment for debt is found in the constitution of Ohio, from which ours is adopted word for word, and which has existed in that state for over half a century. I have yet to learn of an authority in that jurisdiction, or action by the law-making body, recognizing the power of the legislature to coerce payment of taxes levied for public revenues by fine and imprisonment for failure to pay, the obligation thus imposed. Surely this is some indication of the soundness of the construction heretofore given to an identical provision in our own constitution. It is held there, as here, that the bastardy act, providing for a judgment against the putative father, and its enforcement by imprisonment, may be resorted to, and that such judgment is not a debt, within the meaning of the constitutional provision under consideration. *Musser v. Stewart,* 21 Ohio St., 353. While the section has been construed in various ways by the court of last resort of that state, none of the decisions relating thereto give countenance or support to the construction adopted in the majority opinion in the case at bar. In a very early case in one of the inferior courts of that state that provision of the constitution was under consideration, and it is there said: "The 15th section of the first article of the constitution declares, 'That no person shall be imprisoned for debt in any civil action, on mesne or final process, unless in cases of frauds.' This provision is contained in the bill of rights, and is an explicit declaration that the people have reserved to themselves the sacred boon of personal liberty, and have denied to the government all control over their persons, except for the commission of crimes, and the isolated case of fraud in their business transactions. This declaration is regarded as an ample safeguard, without either legislative or judicial construction, and admits of no such thing by either the one or the other departments of the government." *Messenger v. Lockwood,* 9 West. Law J. [Ohio], 521. This construction appears reasonable and fairly supported by the language used. On the same point it is stated in the syllabus

in *State v. Mace,* 5 Md., 337 : "The term 'debt,' in that clause of the constitution which provides that 'No person shall be imprisoned for debt,' is to be understood as an obligation arising otherwise than from the sentence of a court for the breach of the public peace or commission of a crime." I hope I may be pardoned for quoting at some length from the opinion of the court in the case last mentioned, because my own views are reflected therein quite as clearly as I could express them in language of my own choosing. The court says: "The 44th section of the 3d article of the constitution declares: 'No person shall be imprisoned for debt'; and the court of common pleas have decided in this case that a fine imposed by a justice of the peace for a violation of the act of 1854, chapter 138, is a debt within the constitutional meaning of the term. In this view we do not concur. We think the constitution ought to have a common sense interpretation, by which we mean the sense in which it was understood by those who adopted it, and, if it receive such a construction, in our judgment the term 'debt' is to be understood as an obligation, arising otherwise than from the sentence of a court for the breach of the public peace or commission of a crime. Although it is a well recognized canon of construction, that where legal terms are used in a statute they are to receive their technical meaning, unless the contrary plainly appears to have been the intention of the legislature, the principle, however, does not apply to the interpretation of the organic law, which is to be construed, according to the acceptation of those who adopted it, as the supreme rule of conduct both for officials and individuals, and, in conformity with this view, it has been habitual for the supreme judiciary of the United States to derive light and instruction from the commentaries of the framers of the federal constitution. * * * We can not be insensible to the fact that in all the struggles for the abolition of the law for imprisonment for debt, the advocates of the measure contended it was unjust and cruel to place the unfortunate debtor on the same footing with the disturber of the public

peace, or the perpetrator of crimes punishable by fines. The evident intention of the constitution was to relieve those who could not pay their debts, and not to shield from punishment persons who had violated the public law." The supreme court of North Dakota, speaking on the same subject, though with reference to provisions unlike ours (*Granholm v. Sweigle*, 3 N. D., 476, 479), says: "If not a tortious act (and we think it was not), the appellant would be protected from arrest and imprisonment by section 15 of the state constitution, which provides that 'No person shall be imprisoned for debt unless upon refusal to deliver up his estate for the benefit of his creditors in such manner as shall be prescribed by law; or in cases of tort; or where there is a strong presumption of fraud.' The term 'debt,' as employed in section 15, *supra*, is manifestly used in a broad sense, and hence will embrace such obligations to pay money as arise upon the law, as well as those which arise upon contract.". The supreme court of Georgia, in *Cooper v. Mayor*, 4 Ga., 68, holds that where a tax had been imposed by a city ordinance upon free persons of color, and in case of non-payment the act provided that such person should be arrested and committed to the common jail, and there confined until the same was paid, such imprisonment was repugnant to the laws of the state and therefore void. In the authorities referred to the word "debt," when found in an organic law, is given a broad and popular meaning, as it occurs to me ought to be done. If, as is said, such a provision denied to the government control of the persons of a state, except for the commission of crimes or in cases of fraud, or if the word "debt" is to be understood as an obligation arising otherwise than from the sentence of a court for a breach of the public peace or the commission of a crime, or if it embraces obligations to pay money as arise upon the law, as well as those which arise upon contract, then may it not, in reason, be said that an obligation imposed by the levying of a tax for revenue purposes is a debt fairly within the scope and purview of the word as used in the constitution, and

Rosenbloom v. State.

that the decisions overruled have such support in principle and on authority as not to justify their condemnation in order to adopt a construction which is more technical and less liberal?

In all the authorities cited in the majority opinion, a tax is recognized as a debt, in its broad and comprehensive sense, but is held not to come within the purview of the word as used in the organic law, for different reasons,— some upon one ground and some on others; but the tendency of all is to limit and restrict the meaning, rather than to use it in a popular sense. It is also to be noted that in many of the statutes and constitutions the language used is altogether different in meaning from our own. In some states the exemption from imprisonment for debt is limited to contracts, either expressed or implied, and does not extend to obligations arising *ex delicto*. Surely it will not be contended that under our constitution a civil action for a liability founded on tort can be enforced by imprisonment, and yet, to be consistent, my associates must so construe our constitution, in order to justify the doctrine enunciated. In *Re Dassler*, 35 Kan., 678, cited in the majority opinion, the supreme court of that state holds that "road assessments or levies are not debts within the meaning of the constitutional provision abolishing imprisonment for debt, as such provision applies only to liabilities arising upon contract." It is evident, by a reading of the opinion, that the right to imprison is also justified as an exercise of the police power. Says the court: "It was decided by this court, in *Re Wheeler*, that 'the provision of the constitution [sec. 16] declaring "no person shall be imprisoned for debt except in cases of fraud," applies only to liabilities arising upon contract,' therefore road assessments or levies are not debts within the meaning of the constitutional provision abolishing imprisonment for debt. The power to impose labor for the repair of public highways and streets has been exercised from time immemorial, and comes within the police regulation of the state or city. A commutation of such labor in

money in lieu of work, while in the nature of a tax, is not in common speech or in customary revenue legislation, understood as embraced in the term tax. The power to impose this labor is exercised for public purposes, and the general good and convenience of the community." *City of Charleston v. Oliver*, 16 S. Car., 47, 52, was a case relative to the right of enforcing payment of a license tax by imprisonment, and it was there held that the abolishing of imprisonment for debt did not apply to debts due as taxes. This case supports the general proposition laid down by Judge Cooley, and is the only one directly in point which may be said to fully sustain the doctrine announced in the majority opinion. In that case, as a reason for adopting the construction which it did, the court says: "The manifest object was to deprive the citizen of the power to have his fellow-citizen imprisoned for non-payment of his debt. This power, in the hands of private individuals, had long been a subject of discussion, and had been previously circumscribed by the enactment of the Insolvent Debtors' and Prison Bounds acts, which had no application to taxes, and the object of the clause in question, undoubtedly, was still further to limit this power by confining its exercise to 'cases of fraud.'"

Some of the authorities cited relate to an exercise of the right of regulation under the police powers of the state, and on decisions of that character I have no comment to offer. This power must be conceded, and is too firmly established in our system of jurisprudence to be regarded as other than one of its important branches, and necessary for the welfare and protection of society.

What I have heretofore said applies only to my conception of the duty of this court to adhere to the precedents already established, and what appears to me to be sufficient reasons therefor. I have only spoken of what, in my judgment, is a very proper construction of the scope and effect of the constitutional provision declaring against imprisonment for debt, when applied to measures for the collection of taxes of a purely fiscal character, and solely for

the purpose of raising revenues for the support of government, whether of the state and its political subdivisions, or of any municipality therein. There is another and equally important view of the question which is being decided when it is viewed and considered as imposing a license tax, as distinguished from the exercise of the taxing power generally. The majority opinion not only, in terms, overrules the three prior decisions mentioned, but in effect, and indirectly, overturns and repudiates the doctrine announced and adhered to in a long line of decisions, beginning with *State v. Bennett,* 19 Nebr., 191, to the effect that an occupation or purely revenue-producing tax can not be levied and collected as a condition precedent to the issuance of a license to engage in the business taxed; that, when so levied and collected, the tax becomes license money, to be disposed of in the manner provided by section 5, article 8 of the constitution. In escaping the provisions of the constitution against imprisonment for debt, my brothers have come in conflict with section 5, article 8, which declares that all license moneys shall be paid into the common-school fund, when collected. This latter section of the constitution by this decision has been restricted in its application, in my opinion, much more than is warranted by its unambiguous language, or than was the evident intent of its framers. It now must read, if I correctly understand the import of this decision, that all license moneys, if collected under an act or ordinance whose chief object and aim is regulation, must be paid into the common-school fund, but, if the main purpose appears to be the raising of revenues, then the license moneys derived therefrom may be applied to any lawful purpose provided by such act or ordinance. To this construction I can not assent. The section, in unmistakable terms, provides that all license moneys shall be paid into the common-school fund. There is no exception or qualification. and if the tax is a license tax, if it is required to be paid as a condition precedent to obtaining the license, or engaging in the business, if it is made unlawful to engage in the

business taxed without a license, then the fees thus derived, by whatever name the act or ordinance may be called, and whatever may appear to be its chief aim and object, are license money, and must go where the constitution directs, or that instrument is violated. This section of the constitution has made it impossible to raise revenue for general purposes by clothing an act in the garb of a license law, and providing for criminal prosecution and punishment as a means of coercing payment of the tax thus imposed. The section decrees, in unmistakable terms, that all moneys so derived shall be paid exclusively into the common-school fund. This court first fell into an error in this respect in the opinion in the case of *State v. Boyd,* 63 Nebr., 829, from which I dissented, where the rule was announced that, in construing ordinances providing for license taxes, if the purpose appeared to be to raise revenues, the money was a tax, but, if regulation was the end and object in view, the money results from an exercise of the police power, and is license money. The standard there set up by which the application of the moneys derived as a result of licensing a business is to be determined was an arbitrary one, and at variance with the intent and meaning of the language used in section 5, article 8, of the constitution, which neither makes nor warrants such distinction. The true rule, in my judgment, should be that if, in such an act or ordinance, there is any element of regulation, a license tax is justifiable, and its payment may be enforced by declaring the business taxed unlawful, and providing for punishment by fine and imprisonment for engaging in the business declared unlawful without procuring a license therefor. If the measure is solely a revenue-producing act, without any element of regulation, and in substance an occupation tax, then it must be justified and enforced under the taxing power, and as a civil liability only. I understand the rule to be of quite general application that, if there is any element of regulation in a licensing tax act, then the act is valid as an exercise of the police power, even though the collection of

revenues be one of the objects, and incidental thereto, and that it is not at all necessary that regulation shall be the paramount aim and object. This court has recognized the distinction between the two forms of taxation in *Pleuler v. State*, 11 Nebr., 547, 566, where it is said: "By the constitution of this state, the legislature, within certain specified inhibitions and limitations, is invested with full legislative power. And this power includes, as no one will deny, that of police regulation, which being neither defined nor specially limited, is practically left by the constitution to legislative discretion, so long as no right secured by that instrument is encroached upon. Taxation is also a legislative power, and is specifically mentioned in the constitution, but always in connection with the subject of revenue, for the support of the government generally, or some particular department or branch of it. And it is in such connection that we find the requirement of uniformity. This being so, we are led to conclude that this constitutional injunction has reference solely to taxation, pure and simple, according to the commonly accepted meaning of that term, for the purpose of revenue merely, and not those impositions made, incidentally, under the police power of the state, exerted either directly or by delegation, as a means of constraining and regulating what may be regarded as a pernicious or offensive act or business,"—citing and quoting from a large number of authorities. The supreme court of the United States says: "The power to license is a police power, although it may also be exercised for the purpose of raising revenue. We can not say, as a matter of law, that when a municipal corporation is authorized 'to regulate, tax and license ferry-boats,' the imposition of a license fee of $100 per boat is not within the power to regulate and license, and is consequently not within the police power." *Wiggins Ferry Co. v. East St. Louis*, 107 U. S., 365, 27 L. Ed., 419. In *State v. Ashbrook*, 48 L. R. A. [Mo.], 265, 269, it is observed: "In order to sustain legislation of the character of the act in question as a police measure, the courts must be able to see that its object to

some degree tends towards the prevention of some offense or manifest evil, or has for its aim the preservation of the public health, morals, safety, or welfare." Many other authorities might be cited, but the above are deemed sufficient for present purposes. Ordinarily, and I think it was so contemplated by the constitution framers, a license tax arises from an act of regulation, and, as expressed by the United States supreme court, is an exercise of the police power of the state. It is the exaction of a fee for the privilege of engaging in a specified business or vocation. It is not a tax on the business, but is a condition precedent to the right to engage in it. The business is regarded as one requiring regulation, and the fee is exacted as an efficient means of accomplishing the desired result. It is made unlawful, and imprisonment provided as the punishment not for failure to pay the tax, but for engaging in a business declared unlawful unless a permit is granted by the proper authorities to engage therein, and the required fee paid therefor. This is made manifest when it is considered that the offending party becomes guilty by engaging in the prohibited act without a license, and no payment of the required license fee thereafter would purge him of such guilt. He is not imprisoned until he pays the license fee, but until he has paid the fine or served the term of imprisonment imposed for its violation. When a tax is levied solely for revenue purposes, and on different kinds of business or callings, it is properly demoninated an occupation or business tax, and rests on the same general principles as the imposition of taxes generally for revenue purposes. The first is required for the privilege of engaging in the business which he is otherwise precluded from pursuing, and as a means of regulation, and the latter levied on the business he is already lawfully engaged in. . With these distinctions kept clearly in mind, the validity of any law on either branch of the subject ought not to be very greatly difficult of determination. The doctrine has never heretofore gained a foothold in this state which authorizes the exaction and collection of a business tax for purely revenue

Rosenbloom v. State.

purposes under the guise of an act to license the business taxed, and with authority to imprison the delinquent if the tax is not paid. And I can not conceive of any state of affairs which would, permit this to be done without expressly violating the constitutional provision declaring all moneys derived from licenses must be applied to the one specified purpose.

It is clear to my mind that the act, the validity of which is in question in the present case, is an act of regulation, and was so intended by the legislature, and not an act solely for the purpose of raising revenue, as held in the majority opinion. It seems to me almost too obvious for argument that the amendment of the act of the legislature of 1901 was chiefly for the purpose of better regulating the different kinds of business therein mentioned, and to prevent the indiscriminate peddling by wholly irresponsible parties, to the detriment of the different communities of the state, and to prevent imposition on the people generally. It bears on its face the stamp of regulation, protection to the inhabitants and the preservation of the public welfare. Its tendency is to confine the business licensed in the hands of but a few persons in each county. It has features that would indicate an intent to, in a measure, prohibit, and can this be regarded as other than for the purpose of regulation? The very fact of requiring every person included in the provisions of the act to take out a license before engaging in the business, to have a record of the issuance of the same and the name and residence or location of the party licensed, and to require an exhibition of the license when requested, are all well calculated to act as a regulation, and to dignify the calling in its importance, and to restrict it to the more responsible of those disposed to engage in the business. It is the same regulation and restraint that lies at the foundation of almost every act requiring a license fee to be paid, and the issuance of a license to the person thereby authorized to engage in a business otherwise made unlawful. The statute prior to 1901 provided generally for a tax of

$30 on each peddler of watches, clocks, jewelry or patent medicines, and all other wares and merchandise, for a license to peddle throughout the state for one year, and provided a penalty of $50 for a violation of the act, the guilty party to stand committed until the fine was paid. By the amendment of 1901 the act was made to apply only to peddlers plying their vocation outside the towns and cities, and graduated the tax from $25 on the walking peddler to $100 on the one using a team of four horses, and excluded from the provision of the act those who sold their own work or production, or educational, and those selling at wholesale to merchants, and persons selling fresh meats, fruit, farm produce, trees or plants, exclusively. Why these changes in the provisions of the original act, discriminations, and exceptions, if the raising of revenues was the aim and object in view? Who can doubt, in view of these amendments, that the intent of the legislature was to regulate the business of peddling by a certain class that was deemed detrimental to society, and consequently some form of regulation and restraint was required, and that such was the object in enacting the law, rather than that the sole purpose was to raise revenues? Peddling has from time immemorial been regarded as a subject justifying the exercise of the police power by regulating acts, and I entertain no doubt that such was the aim and object of the legislature when it amended, as it did in 1901, the act theretofore existing which related to the same subject. An instructive and interesting opinion on the point now being considered, and under a statute of the same character as ours, is found in *Morrill v. State,* 38 Wis., 428. It is there held: "Laws restricting the business of hawkers and peddlers, or providing for the licensing thereof, are an exercise of the police power of the state, and do not lose this character by requiring payment of the license fees into the state treasury." It is observed by Lyon, J., who wrote the opinion of the court: "The statute was doubtless enacted in the interest of merchants having fixed places of trade, on the theory that a sound public policy demands

that these should be encouraged, and traveling merchants or peddlers discouraged; and for the further purpose of protecting honest and well disposed citizens from the arts and importunities, and frequently from the dishonest practices, of a class of traders to whom they are usually strangers, and who are not as directly amenable to those legal and social restraints which must necessarily greatly influence the business conduct of a merchant having a fixed place of business, and depending for his patronage upon one and the same community." And further on: "The reasons (or at least some of them) why the legislature enacted the law of 1870, have already been stated. That they are stated correctly, and that the common law regarded hawkers and peddlers with disfavor, and their vocation opposed in some degree to public policy, will appear by reference to Jacobs' Law Dictionary." After quoting from the authorities it is further stated: "We give the language of the author merely to show the grounds upon which, centuries ago, parliament regulated and restricted the business, and that such regulation and restriction is an exercise of police power in the interest of the public. But with this disclaimer we must be permitted to add that, undoubtedly, resort is often had to this business for the sole purpose of obtaining admittance (which could not otherwise be obtained) into private dwelling houses in furtherance of some criminal or unlawful object. This is another reason why the restriction or regulation of the business is an exercise of police power." The act under consideration in the case at bar, in my judgment, must be justified and upheld as an exercise of the police power. It is presumed to be constitutional and valid, and all intendments are to be taken in favor of the validity of the act, and the exercise of lawful powers by the legislature in its enactment. Whether it will, when thoroughly considered, square with all the express provisions of the fundamental law, I can express no opinion until a full investigation is made of the subject when it is considered in the light of an act of regulation. It would be a vain and useless

effort for me alone to undertake the determination of that question; hence I must content myself with dissenting from the views of my associates in upholding the law as a valid exercise of the taxing power, and in overruling the several prior decisions mentioned in order to reach that conclusion.