CENTRAL GRANARIES COMPANY, APPELLANT, V. LANCASTER
COUNTY, APPELLEE.*

FILED OCTOBER 18, 1906.   No. 14,314.

1. **Taxation: ASSESSMENT.** Section 66, ch. 73, laws 1903, provides that
grain brokers shall be assessed on the average amount of capital
invested in the business for the preceding. year, instead of on
the amount of grain on hand on the first day of April.

2. **Double Taxation.** Taxing a grain company on its real estate and
other tangible property, on the amount of its average capital,
and also on the grain contained in its elevators on the first day
of April, is, to the extent of the grain so assessed, double taxa-
tion, from which, in a proper proceeding, the courts will grant
relief.

APPEAL from the district court for Lancaster county:
ALBERT J. CORNISH, JUDGE. *Reversed.*

*Hall, Woods & Pound,* for appellant.

*F. M. Tyrrell, J. L. Caldwell* and *C. E. Matson, contra.*

BARNES, J.

The appellant is a corporation organized and existing
under the laws of this state. Its main office is in Lincoln,
Lancaster county, Nebraska. It owns and operates about
50 elevators, mostly in this state, and its business is that
of buying, cleaning, selling and shipping grain to the
various markets of the world. It owns and operates ele-
vators at some 40 different towns, situated in several
different counties throughout the state. It also owns
elevators at Lincoln, Rulo and Holdrege, called cleaning
elevators. The manner of conducting its business is such
that in handling, disposing of and shipping its grain to
market it all passes through the cleaning elevators at Lin-
coln, Rulo or Holdrege. It buys no grain at its Lincoln
cleaning elevator, and the grain that goes through this
elevator comes from some of its outside elevators, situated

See opinions on rehearing, pp. 319, 327, *post.*

in other counties in different parts of the state, where it
is originally purchased. In 1904 appellant made its re-
turn under oath to the assessor of Lancaster county of its
property subject to taxation in that county, which return
was in substance as follows:

Capital stock .......................$350,000
Surplus and profits .................. 70,000
                                      _____

     Total valuation of stock........          $420,000
Property assessable in Lancaster county
    (itemized) ....................... $83,265
Property outside of Lancaster county
    otherwise assessed................. 336,735
                                      _____

     Total valuation of stock........          $420,000

The assessor of Lancaster county raised the amount of
the property scheduled as assessable in that county
$10,000 to cover the grain in appellant's elevator in the
city of Lincoln. Objections thereto were filed with the
board of equalization. A hearing was had, the objections
were overruled, and the case was appealed to the district
court, where a trial resulted in the dismissal of the appeal,
an affirmance of the order of the board of equalization,
and an appeal therefrom was taken to this court.

The bill of exceptions establishes the following uncontro-
verted facts: First. The appellant's capital stock and
surplus was $420,000, which represented all of its prop-
erty. $83,265 worth of that property was situated and
taxable in Lancaster county. The remainder of it, to wit,
$336,735 worth, was not used in Lancaster county, but was
located and used in other counties. Second. The appel-
lant's Lincoln elevator is a transfer and cleaning house,
and no grain goes into that elevator except grain in transit,
on its way from the company's elevators situated in other
counties. Third. That the item in controversy, to wit,
$10,000 worth of grain in appellant's Lincoln elevator,
was grain in transit. It is claimed by appellant that this
grain in transit was purchased by, or represented a part of,

the $336,735 of capital located and used in counties other than Lancaster, and had theretofore been assessed in said counties. It is contended by the appellee that the testimony does not sustain the foregoing claim.

We find that F. D. Levering, appellant's assistant treasurer, testified in substance that the capital stock and surplus of the company in 1904 was $420,000; that his company owned and was then operating from 45 to 52 elevators in Nebraska and Kansas, 8 or 9 in Kansas and the remainder in Nebraska; that the only elevator the company had in Lancaster county, outside of Lincoln, was at Waverly; that the only place the company buys grain in Lancaster county is Waverly; that it was not using any of its capital in buying grain in Lincoln; that the company bought no grain in Lincoln; that all of the capital of the company other than the amount invested in permanent improvements was used in buying grain at points outside of the city of Lincoln; that all of its capital, except the listed items reported and assessed in Lancaster county, to wit, $336,735, was invested in grain elevators and grain outside of Lancaster county; that all of this portion of the company's capital was located and was being used by the company in other counties than Lancaster; that it was invested in elevators, cribs, scales, gas engines and grain.

E. J. Herring, who was in the employ of the appellant company, and who has especial charge of the assessment of its property in this state and Kansas, testified as follows: "Q. At the company's outlying elevators in other counties than Lancaster county, do you know what method the assessors of the various counties adopted in arriving at the amount of capital stock the Central Granaries Company was using at these elevators located in these various counties? A. Yes, sir. Q. State to the court whether or not the assessors where these various elevators were located arrived at the amount of capital that you had invested at that particular point by taking into consideration the whole year's business, or volume

of business for the year, in getting at the amount, the average amount of capital invested to the first day of April? A. Yes, sir. Q. And for those computations do you furnish the books to the assessors at these various places? A. Yes, sir; we did. Q. And did they take into consideration, in arriving at the amount of capital that you had invested there, all of the grain purchased during the year, from April 1, 1903, to April 1, 1904? A. Yes, sir."

On cross-examination the witness further stated: "A. They took the average capital, the corn cribs, the elevator, the gas engine, and the bank account, and the horse power, and any other tangible property we had. Q. And added it to the average capital or subtracted it? A. Added it to the average capital. Q. Did they add the real estate? A. We have no real estate. Elevators are personal property. Q. They added the personal property to the average capital? A. Yes, sir. Q. And the cash on hand? A. Yes, sir. Q. And the grain on hand? A. No, sir; I did not say that. Q. That is a part of your tangible property, is it not? A. No, sir; that is figured in this average capital."

The only evidence introduced by the appellee was the testimony of the county assessor, the instructions of the state board to county assessors, and the intructions of the Lancaster county assessor to his deputies. None of this testimony in any way controverts the evidence above quoted. From the foregoing, we are of opinion that the evidence is sufficient to show, *prima facie,* that appellant was assessed in the various counties where it was engaged in business (outside of Lancaster county) to the amount of $336,375 as average capital employed in its business in said counties.

The appellant contends that the action of the taxing officers of Lancaster county in adding $10,000 to its schedule for grain in its Lincoln elevator subjects it to double taxation to that extent, and the district court erred in refusing to grant it the relief prayed for by its

petition.   If its property in other counties had thereto-
fore been assessed for taxation in the manner provided
by law, then its contention is well founded.

That appellant is a grain broker, within the meaning
of section 66, ch. 73, Laws 1903, commonly called the
"New Revenue Law," and should be assessed in the man-
ner therein pointed out, is beyond question.   That section
reads as follows:   "Every person, company or corpora-
tion engaged in the business of buying and selling grain
for profit, shall be held to be a grain broker, and shall,
at the time required by this act, determine under oath
the average amount of capital invested in such business,
exclusive of real estate or other tangible property,
assessed separately, for the preceding year, and taxes
shall be charged upon such average capital the same as
on other property.   For the purpose of determining the
average capital of such grain broker the county assessor
or deputy assessor shall have the right to inspect all
books of account and the checkbooks of such grain
broker and shall determine and fix the amount of such
capital by such inspection."   As we have already seen,
the appellant, before it returned its schedule to the
assessor of Lancaster county, listed $336,375 of its aver-
age capital in other counties.   And this brings us to the
consideration of what is meant by, or included in, the
words "average capital" as used in the section of the
revenue law above quoted.   It would seem that the legis-
lature recognized the difficulty which would arise in
attempting to assess grain brokers on the amount of
grain on hand on the first day of April.   If that method
of assessment should be adopted, then it is safe to say
that grain dealers would have no grain on hand at that
time.   If the plan of assessing the capital stock of cor-
porations dealing in grain, wherever such company or
corporation is located, should be adopted, we might find
all of such capital was invested in grain, stored in
various elevators throughout the state, which would have
to be assessed where located and this would result in

double taxation. So, in order to adopt a method which should be fair to the broker, and at the same time tax the whole of his property, the legislature, by the section in question, provided for taxing the average capital used in the business for the previous year, wherever such business was conducted. In order to properly carry out that plan, it further provided that the broker should furnish his checkbooks and all his books of account to the assessor, who is required to determine "by inspection" the amount of such average capital. The law does not, in terms, provide for the taxation of both the average capital used by the broker in his grain business and the grain purchased therewith, and such could not have been the intention of the legislature. The average capital used in the business evidently means the money used in buying grain, and all of the money so used. By taxing this average capital, it makes no difference what amount of grain is on hand on the first day of April of each year. On that day it may have all been sold, and yet, by taxing the average capital in the place of the grain, the broker would be required to contribute his just proportion to the public revenue. The average capital today may be represented by money, while tomorrow it may be invested in grain purchased and on hand. Again, on the next day the grain may be sold, and the proceeds thereof will then constitute a part, or perhaps the whole, of the broker's average capital. Again, it would seem that the legislature has made a clear distinction between that part of the broker's capital used in the business, that is to say, in buying, selling, shipping and handling grain, and that part of it invested in other tangible property convenient and necessary for the purpose of conducting such business. We take it that by the words "average capital" is meant so much of the whole capital of the grain broker as is used in handling grain, and not that portion which is invested in tangible property for the purpose of successfully conducting the grain business. In construing a statute the court should, if

possible, give a reasonable meaning to all of its words and phrases. All tangible property must be taxed as such, unless otherwise provided by law. The law in question clearly implies that all of the tangible property of the grain broker, except grain purchased and sold, must be taxed as such. And to hold that the grain which he may happen to have on hand must be taxed, in addition to the average capital used in its purchase, would render the words "other tangible property assessed separately" meaningless. That grain is tangible property no one will dispute. But it seems clear that it was intended by the legislature that it should not be embraced in the words above quoted. So, we are of opinion that the average capital required to be listed by the grain broker was intended by the legislature to cover and stand in the place of all grain purchased and sold by him. To assess such grain, in addition to the assessment of his average capital, as above defined, amounts in fact to double taxation, which no one will contend is permissible.

It is contended by the appellee that the rule that a taxpayer who appeals to the district court from the action of the board of equalization in matters of assessment has the burden to show that the decision of the board is erroneous, requires us to affirm the judgment of the district court. It is a sufficient answer to this contention to say that the evidence contained in the record establishes *prima facie*, at least, the contention of the appellant; and where there is no dispute as to the facts, and the record shows forth the action of the board, together with the evidence on which such action is based, the matter then becomes a question of law to be determined by the reviewing court, and not one of fact. In such a case the presumption invoked has no application. It appears from the record that the reason given by the assessor for adding the $10,000 in question to the appellant's schedule was that he was not satisfied that the appellant's average capital had been properly assessed in other counties throughout the state. Neither the

Central Granaries Co. v. Lancaster County.

assessor nor the board of equalization of Lancaster county has any power or jurisdiction to review the action of the assessors and boards of equalization in other counties, and when it was shown by the appellant's evidence that it had listed its average capital in such outside counties, and it was there assessed, that fact raised the presumption that the taxing officers of such counties had correctly performed their duty.

Lastly it is contended by the appellee that the tax on the average capital of grain brokers, provided for by the section in question, is a tax on the business, or, in other words, a business tax, and is not a property tax within the meaning of the constitution; that, in addition to such business tax, it was proper, and it had the right, to tax the grain in question. That the legislature has the power to provide for taxing the business of grain brokers is beyond question. But that it has not done so seems clear. A business tax is defined to be a tax on the privilege of carrying on a business or employment, and is commonly imposed in the form of an excise tax on the license to pursue the employment. It is usually a specific sum, or a sum whose amount is regulated by the business done, or the income or profits earned. Such, for instance, as 2 per cent. on the gross premiums of an insurance company, or any given per cent. on the volume of the particular business conducted. The statute in question, however, makes no such provision. On the contrary, it states in plain terms that "taxes shall be charged upon such average capital the same as on other property." The average capital is thus treated as property, and the amount of the tax levied thereon depends upon the rate of taxation for all state, county and municipal purposes, the same as though levied on real estate, or other tangible property.

We are therefore of opinion that the district court erred in dismissing the appeal herein, and that the appellant is entitled to the relief sought.

For the foregoing reasons, the judgment of the district

court is reversed and the cause is remanded for further proceedings according to law.

REVERSED.

LETTON, J., dissents.

The following opinion on rehearing was filed July 12, 1907. *Former judgment of reversal vacated and judgment of district court affirmed:*

1. **Taxation:** CLASSIFICATION: CONSTITUTIONAL LAW. The classification (laws 1903, ch. 73, sec. 66) of "every person, company or corporation engaged in the business of buying and selling grain for profit" as a "grain broker," for purposes of assessment, and providing for the assessment of the average capital of grain brokers, is not unconstitutional.

2. ———: ASSESSMENT. The amount of capital invested in a business ordinarily is the whole amount of money invested and used in carrying on that business. The average capital of a grain dealer is defined by section 66 of the revenue law to be the average amount which the total investment in the business of the grain dealer exceeds the tangible property which can be separately assessed at the time of assessment. The assessor, from the examination pointed out in the statute, must find what capital of the business there was, if any, from time to time during the tax year, not including in the computation the tangible property on hand and capable of assessment at the time of assessing, and the average or mean of the capital so found is to be assessed as property in addition to the tangible property.

SEDGWICK, C. J.

The facts in this case, so far as the essential questions of law involved are concerned, may be found in the former opinion, *ante*, p. 311. A rehearing was granted, new briefs have been filed, and oral argument heard thereon. The plaintiff is a corporation engaged in buying and selling grain. It operates a large number of grain elevators located in different counties of the state. Among them it operates an elevator in Lancaster county for the transfer and cleaning of grain in transit to eastern markets. It returned to the assessor of Lancaster county for taxation a statement of its capital stock, its surplus

and profits, and an itemized statement of its tangible property assessable in Lancaster county. In this statement was not included $10,000 worth of grain in its Lincoln elevator. The assessor added this property to the schedule, and whether he erred in so doing is the question to be decided. Section 66, ch. 73, laws 1903, is quoted in the former opinion. Several of the provisions of this section have been debated in this case.

1. The section of the statute under consideration provides that "every person, company or corporation engaged in the business of buying and selling grain for profit, shall be held to be a grain broker," and it is largely from this provision that attorneys for defendant draw their argument that the taxation imposed by this section on average capital is an occupation tax. Section 1, art. IX of the constitution, authorizes the legislature to tax peddlers, auctioneers, brokers, and others named, "in such manner as the legislature shall direct." It is, however, not to be supposed that the purpose of the legislature in providing that a dealer in grain "shall be held to be a grain broker" was to enable it to levy an occupation tax upon grain dealers, and so evade the above provision of the constitution. To determine what class of persons may be included in the term broker for the purpose of levying an occupation tax, it would be necessary to ascertain the true definition of the word broker as that term was generally understood at the time of the adoption of the constitution. The legislature could not enlarge its power to levy an occupation tax by extending the meaning of the words employed in the constitution beyond their reasonable and generally accepted significance when adopted. A different purpose is apparent in adopting a specified term to be applied to dealers in grain. The fact that the words "grain broker" are used instead of some other words is of no significance. By this section the legislature provides a manner to ascertain the value of the property of "persons, companies or corporations engaged in the buying and selling

of grain for profit," in some respects different from that employed in general. They are classed as grain brokers and are to be assessed upon their average capital. If the legislature has power to "require the assessment of average capital" instead of the assessment of the property owned at some specified time, and if there is a special and sufficient reason for using this method in assessing those engaged in buying and selling grain for profit, a reason that does not apply to assessment in general, then there can be no doubt of the power of the legislature to so classify such interests for assessment. *Rosenbloom v. State*, 64 Neb. 342. Some reasons are stated in the former opinion for assessing average capital invested in dealing in grain. In addition to what is there said, we quote the following very apt suggestions from the plaintiff's brief: "But the capital invested in the business is continually changing form from money to grain and then back to money. Hence, if taxed as grain, at a time when the grain on hand had all or for the most part been sold, but a fraction would be reached; if taxed as money, when a large amount of grain was on hand, but a fraction would be reached; if assessed both as grain and as money, the one being a mere form of the other, the same capital would be taxed twice; if assessed by taking the sum of the grain and the money on hand April 1, the danger would be that money is easily juggled and concealed. If an arbitrary date were taken, there would be a likelihood that grain brokers would have very little grain on hand and very little money on deposit on that day." It is, however, contended in the defendant's brief that the assessment of average capital is not the assessment of property within the meaning of the constitution, and therefore it is beyond the power of the legislature to provide for assessment in that manner, except as an occupation tax. This argument is not convincing. It will be conceded that the legislature might require the property owned by the taxpayer on the 1st day of May, or on any other specified day of the year, to

24

be valued for taxation, as well as to select the 1st day of April for that purpose. The requirement of the constitution is that the value of the taxpayer's property for assessment shall be "ascertained in such manner as the legislature shall direct." Property necessarily fluctuates in value, and ownership is changed from one person to another, so that if the average value during the year could be accurately ascertained it would furnish the true basis for taxation. Taking the value of each individual on some given day of the year is supposed to be, in ordinary cases, the most practicable method of reaching a just equalization of property for assessment.

2. A very important question in this case, and one that has been very much debated, is what is meant by average capital as used in the statute referred to. In our former opinion it was said: "Average capital used in the business evidently means the money used in buying grain, and all of the money so used." It is also considered in that opinion that grain in elevators is a part of the average capital of the business, and, being assessed as a part of such average capital, it cannot be separately specifically assessed. This led us to the conclusion that the assessor erred in placing the grain in plaintiff's elevator in Lincoln upon the schedule for assessment. The average capital of the business is generally understood to mean all of the money invested in the business and would include all property used in the business.

There is in New York a general statute which provides that nonresidents of the state doing business therein shall be taxed on the capital invested in such business as personal property. It was held that by the words "capital invested in such business" was meant the money which was put into the business with the intention that it shall be used in the transaction of the business. *People v. Feitner*, 67 N. Y. Supp. 893. This is the ordinary use of the word capital. Does the use of these words in this section of the statute and the connection in which they are used require us to infer a different meaning? It is

said that the words "other tangible property" used in con-
nection with the words "real estate" in specifying what
shall not be included in the average capital must be con-
strued to mean other *like* tangible property, that is, other
tangible property of the character of real estate. It is
suggested that the connection in which these words are
used and the subject matter of the section indicate this
intention of the legislature. The constitution requires
that all property of every nature be in some manner
valued for taxation, and be required to bear its share of
the public burden. The construction thus contended for
does not seem to be more usual and natural than to
consider the words used as equivalent to "all tangible
property including real estate." If, in ascertaining the
average capital for assessment as such, we include all
tangible property that is capable of being assessed sep-
arately, including real estate, and deduct the value of all
property already separately assessed, the object of the
legislature would seem to be reached. This is analogous
to the manner prescribed for assessing banks. The value
of the capital stock of a bank for assessment is ascer-
tained by taking the sum of its liabilities from the sum
of its assets, and from this valuation of the stock, when
so ascertained, is deducted for assessment the value of
the tangible property that is otherwise assessed which
enters into the valuation placed upon the assets. This,
of course, gives the same valuation of capital stock for
assessment as would be obtained by excluding all tangible
property otherwise assessed in computing the assets of
the bank, and we see no reason for giving any other
construction to the section of the statute under consid-
eration. This construction of the statute requires that
the tangible property of a grain broker, including real
estate, be assessed in precisely the same manner as the
property employed in other ways is assessed.

A similar idea is found in the statutes of the state of
Louisiana. Their revenue act contains the following dec-
laration: "In assessing mercantile firms the true intent

and purpose of this act shall be held to mean, the placing of such value upon the stock in trade, all cash, whether borrowed or not, money at interest, open accounts, credits, etc., as will represent in their aggregate a fair average on the capital, both cash and credit, employed in the business of the party or parties to be assessed." The supreme court of that state had occasion to construe that statute in *Swift & Co. v. Board of Assessors*, 115 La. 322, 38 So. 1006. The court also discussed the meaning of the words "a fair average on the capital employed in the business." A definition of average is quoted from the Standard Dictionary: Average is "obtained by calculating the mean of several amounts, numbers, or quantities." The plaintiff in that case was engaged "in buying and selling of fresh meat shipped to the city of New Orleans in carload lots." The question involved was as to the proper method of ascertaining the fair average capital employed in the business. In the statement of the case by the court the following language occurs:

"In assessing the merchandise or stock in trade, the taxing authorities took the total amount of meat received during the previous year, and divided the same by 12, thus reaching what is called the 'average' value of stock on hand during the previous year." In regard to this method of obtaining the average value, the court said: "The assessors' contention is that the monthly receipts of merchandise during the year should be added together, and their sum total divided by 12. This method necessarily counts merchandise sold during the month as a part of the stock on hand at the end of each month, and is an assessment of the amount of purchases, rather than of stock on hand. As the money or credits received from sales are also taxable, this method would lead to double taxation, in contravention of the express provisions of section 7, which declares that no property shall be taxed twice in the same year.' Under the assessors' rule, a merchant whose entire capital is $5,000 might be taxed on $10,000 on stock in trade, if he each month sold $5,000

of merchandise, and reinvested the proceeds in other merchandise. On the same theory a butcher or other vendor of perishable commodities, who buys and sells from day to day $100 worth of stock, might be taxed on $3,000 of capital. The circumstance that the merchant or dealer turns over his capital every six months, or every month, or every day does not affect the question. His capital, plus profits or minus loss, remains the same; and it is this average capital, represented by merchandise, money, rights, credits, which the statute intends to reach."

The court said that their statute does not provide "that the capital *eo nomine* shall be assessed, but that all the elements which enter therein shall be so valued as to represent a fair average of the capital employed." The same may be said of our statute, if we look to its intention and results. While our statute names "average capital," and declares that "taxes shall be charged" thereon, and so, when taken literally, requires average capital to be assessed in that name as an element of property, still the result and the manifest intention of the statute is to enable the assessing authorities to ascertain the proper assessable value of all the property used in the business. We may then say with the Louisiana court: "The meaning of the proviso, therefore, is that the average amount of stock, money, rights, credits, etc. (including real estate), which may vary through the year, shall be taken as the basis of assessment." That is, all property, real and personal, used in the business is to be assessed, and if the assessor, from the examination of the books, etc., which the statute requires him to make, finds that the property so assessed is less than the property (including money on hand or in bank, and real estate) in use in the business at other times during the preceding tax year, he ascertains from the books of account and checkbooks of the grain broker how much more property has been in use in the business at other times during the year than is so used at the time of the assessment. For instance, if he finds no grain, or but a small quantity, on

hand at the time of the assessment, and that at other times during the year there have been large quantities of grain on hand, and that all other elements of the net assets of the business have remained substantially constant, he should ascertain from the accounts, etc., how much this excess of grain on hand has been from time to time, and the average or mean of this excess (in the statute denominated "average capital invested") should be added to the assessment of the visible and tangible property. The true average capital would be the average sum invested in the business from time to time. The statute, however, points out the way to find what part of the true average capital has not been reached by the assessment of the tangible property found at the time of assessment, and requires the assessment to be corrected by adding this excess. If this is the true interpretation of the statute, then the assessor should value for taxation all of the property of the person, company or corporation engaged in the buying and selling of grain for profit, including real estate and grain on hand, and should then ascertain, in the manner that the statute points out, whether the average capital invested in the business during the preceding tax year was greater than the capital which he has so assessed, and, if he finds that it was greater, then he should add to his assessment such excess of the average capital invested. In this case the plaintiff omitted from its statement of property for taxation the amount of its grain on hand, and the assessor properly added this amount to the assessment. By its judgment the district court approved of this action on the part of the assessor and was right in so doing.

The judgment heretofore entered in this case is vacated and the judgment of the district court affirmed.

JUDGMENT ACCORDINGLY.

BARNES, J.

For the reasons given in our former opinion, I dissent from the foregoing conclusions.

The following opinion on motion for rehearing was filed October 16, 1907. *Rehearing denied:*

1. **Taxation:** AVERAGE CAPITAL. The average capital of grain dealers, mentioned in section 66 of the revenue law (laws 1903, ch. 73), is not the average of the total capital used in the business, but is the excess of such capital over the real estate and other tangible property which can be viewed by the assessor and "assessed separately."

2. **Average capital** is not average purchases, nor average sales, and cannot be found by adding together the amount of purchases or the amount of sales during the year, and dividing the sum by an arbitrary divisor.

3. **Average capital** is the average of the amount of cash and all other property of every kind used in carrying on the business; and, if there is an excess of this average of capital over the amount of real estate and other tangible property that can be viewed by the assessor, then such excess is to be added for assessment.

SEDGWICK, C. J.

The appellant has filed in this case a brief in support of a motion for a rehearing. From this brief it appears that the opinion herein is not at all understood by counsel for appellant. Speaking of the opinion the brief says: "It is vague, hazy, indefinite, and muddy as it can be, and I speak respectfully. It furnishes no definite rule or guide that can be followed either by the assessor or the grain broker." The case is one of very much importance. The opinion is supposed to be a guide for assessors in all parts of the state in assessing grain dealers. If the court has failed to so state its views as to enable the learned and able counsel for appellant to understand them, it would seem to be desirable to attempt to make the opinion clearer, so that assessors, who are not supposed always to possess the legal acumen of appellant's counsel may be able to understand the construction which the court attempts to give to this statute. Counsel understand that the average capital of a grain dealer is to be found by adding together all the purchases

of grain during the year and dividing the total amount by some indefinite number selected at random. An extended illustration of this proposition advanced by counsel is given in the brief, and we will quote it in full as a basis of our explanation of the views of the court. It is as follows: "Let me give a practical concrete illustration of this proposition, for the purpose of testing its accuracy, and of showing that the above statement is correct. Let it be admitted that the volume of business at Friend, Nebraska, for the year 1905, was $65,000, that is, that there was purchased at that point by the appellant during the year 1905, altogether, $65,000 worth of grain. This was made up of a great number of items that were purchased during the year and is the aggregate of all of the different purchases made by that company at that point during the year. Now, if we use 20 as the divisor for the purpose of getting the average capital on any given day (I take 20 as the divisor because that is the number used in this county and many others), I shall get the average capital, which will be $3,250. Now, suppose one of the items that goes to make up the $65,000 is a $5,000 purchase of grain which is still in the elevator at the date of assessment. Should this grain be assessed separately as tangible property? If so, then the assessment would stand thus:

Average capital ........................$3,250
Amount on hand as tangible property.... 5,000
_____
Total assessment ...................$8,250

Can it be successfully contended by anyone that in this method or process you have not assessed the $5,000 of grain twice, once as average capital and once as tangible property?" This proposition of counsel shows two important particulars in which the court has been misunderstood:

First. We do not consider that average capital can be found by adding the total of purchases during the year and dividing that amount by any number whatever,

much less by an indefinite number selected at random. If the grain dealer should purchase $10,000 worth of grain each day during the year, or on each one of 300 days during the year, and should sell the grain so purchased on each succeeding day, the total amount of purchases would be $3,000,000, and if we select the divisor at random, say 20, "because that is the number used in this county and many others," we would have an average capital of $150,000, whereas the capital needed for such transactions during the year would be only $20,000. The amount received for the second day's sale could be used for the third day's purchase. It is very plain that the average of the purchases would not be the average of the capital invested, and this fundamental error runs through the entire brief. The average capital could not in any event be ascertained by using an arbitrary divisor. In the above demonstration taken from the appellant's brief the divisor 20 is used "because that is the number used in this county." Manifestly counsel would have as readily accepted any other number as a divisor. If he had happened to have selected 25 as a divisor the average capital would have been $2,600 instead of $3,250. If he had taken 12, the number of months in the year, as a divisor, as was done in the Louisiana case cited in the opinion, the average capital would have been $5,416.66⅔; and, again, if he had selected 52 as a divisor, the number of weeks in the year, the average capital would have been $1,250. Manifestly the average capital used in a given business cannot be ascertained by such methods.

Second. Counsel understands the opinion to mean that the average capital used in the business is to be ascertained by some method and is to be assessed at all events, and, in addition to this average capital, the real estate and all tangible property is to be assessed also, whereas the view of the court is that all tangible property of a grain dealer is to be assessed in precisely the same manner as the property of other persons and corporations is assessed. In addition to this, the assessor is to ascer-

tain whether this result is a fair assessment of the grain dealer's property used in the business. If he finds no grain or cash on hand, and all other elements of the property used in the business remain substantially constant during the year, it would be manifest that by assessing the tangible property found by the assessor he would not have reached all of the property used in the business. It is only in such case that he is required to assess average capital, and it is not the total average capital that he is to assess, but it is the average amount of capital invested in the business, exclusive of real estate and other tangible property assessed separately. If the real estate and other tangible property which is assessed is not equal to the money and property used in the business on an average during the year, then he is to add to the value of the real estate and tangible property an assessment of .the average amount of capital in excess of the real estate and tangible property. This average amount of capital in excess of the real estate and tangible property he is to determine from the books of account and checkbooks, as pointed out in the statute. In determining this excess of capital above the amount which he finds as tangible property, he is not confined to the purchases of grain nor to the sales of grain, nor is he to use arbitrary divisors. If the grain dealer is to be assessed only upon the property in sight on any given day, and we suppose that he is dishonest enough to seek to avoid taxation, his cash and grain can be so manipulated by him as to bring about that result. If, on the other hand, we suppose (which would, of course, generally be the case) that he is honest and does not resort to manipulation, then he might be in some cases unjustly taxed. But the law does not assume that he will accumulate grain on the first day of April for the purpose of swelling his assessment. There are, of course, manifest difficulties in the way of accurately determining in all cases the average amount of capital used during the year in excess of the real estate and other tangible property which the assessor can view on the first

day of April. The legislature evidently supposed that this difficulty in determining the excess of the capital used is not so great as to make it necessary to allow grain dealers to escape a fair assessment by placing their grain and cash beyond the view of the assessor on the first day of April. No scheme of assessment is perfect. If it comes as near an exact equality of assessment as the circumstances of the case will admit, and no manifest injustice is done, it is all that is required.

We think that the statute in question meets this requirement, and that the construction which we have given it is the correct one.

The motion for rehearing is

OVERRULED.